IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| BRANDI GOODWIN, | : | Case No. 2:22-cv-3118 |
| Plaintiff, | : | Judge Marbley |
| v. | : | Magistrate Judge Jolson |
| UNUM LIFE INSURANCE COMPANY OF AMERICA, | : | |
| Defendant. | : | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**

This is an ERISA case asserting two claims for disability benefits under 29 U.S.C. §1132(a)(1)(B). In accordance with *Wilkins v. Baptist Healthcare System*, 150 F.3d 609 (6th Cir. 1998), Plaintiff Brandi Goodwin moves for judgment on the administrative record. The motion is supported by the attached memorandum and the exhibits drawn from the administrative record.

Respectfully submitted,

　　/s/ Tony C. Merry
Tony C. Merry　　(0042471)
Trial Attorney
Law Offices of Tony C. Merry, LLC
7100 N. High Street, Suite 302
Worthington, Ohio 43085
(614) 372-7114
(614) 505-6109 [fax]
tmerry@tmerrylaw.com
Attorney for Plaintiff

## **MEMORANDUM IN SUPPORT OF MOTION**

### INTRODUCTION

Although America's COVID national emergency expired in April, nearly one-fifth of COVID victims are afflicted with "Long COVID."[1]  Plaintiff Brandi Goodwin is one of those.

The extent to which Long Covid limits Goodwin's ability to work is reflected in a summary of a phone call between Goodwin and a Unum employee in August 2021:

> *** Of note, throughout the call the EE [employee] was easily losing focus of what we were talking about, she could not complete sentences often.  The conversation needed frequent redirection or would circle back to something that had previously been discussed.  EE stated several times "I lost my train of thought", "What was I saying?", "Where was I?"  It seemed that the longer the call lasted the more this happened, indicating a level of fatigue.  Also her voice became softer through the call, and the speech pattern more deliberate.  By the end of the call EE states that her chest was hurting and she was tired.

ECF 12-6, PID 1744.[2]

As the records Goodwin submitted in support of her claim establish, Long Covid has left Goodwin with a complex and disabling set of ailments, the most significant of which is POTS – Postural Orthostatic Tachycardia Syndrome.  According to the National Institute of Health, POTS is "a multisystem disorder characterized by the abnormal autonomic response to an upright posture, causing orthostatic intolerance and excessive tachycardia without hypotension….Prominent symptoms of POTS include fatigue, orthostatic intolerance, tachycardia, and cognitive impairment."[3]

---

[1] https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/20220622.htm.
[2] Citations are to the document and page numbers assigned by the Court's ECF filing system to the administrative record Unum has previously filed with the Court.
[3] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10065129/#:~:text=Recent%20reports%20suggest%20that%20a,COVID%2D19%20POTS%20are%20unclear.

"Recent reports suggest that a significant percentage of COVID-19 survivors develop POTS within 6 to 8 months of infection." However, the "exact mechanisms of post-COVID-19 POTS are unclear."[4]

The ample medical evidence notwithstanding, Unum Life Insurance Company of America, the insurer of the long-term disability benefit available through Goodwin's employer, denied Goodwin's claim for long-term disability benefits. Unum asserted two reasons for denying Goodwin's claim.

First, it denied her claim because it said she suffered from "vertigo" and vertigo was a pre-existing condition. But vertigo is not a *condition*, it is a *symptom* of a *condition*, and the number of *conditions* that might feature vertigo as a *symptom* is potentially large. *See, e.g.,* https://www.nhsinform.scot/illnesses-and-conditions/ears-nose-and-throat/vertigo ("Vertigo is a symptom, rather than a condition itself. It's the sensation that you, or the environment around you, is moving or spinning."). The two *conditions* that disable Goodwin are Long Covid and POTS, and neither of them was pre-existing.

Second, Unum concluded that – vertigo or not – Goodwin was not disabled from performing the material and substantial duties of her job. Several of its reviewers, in fact, concluded that Goodwin was not disabled at all. In light of the overwhelming evidence to the contrary, that conclusion simply cannot withstand analysis.

The evidence unambiguously establishes that Goodwin is disabled from working in any capacity, and that her disability is not the product of a pre-existing condition. Judgment should be entered for Goodwin on her claims.

---

[4] *Ibid.*

## FACTS

### Goodwin's Medical Conditions

Shortly after she began work for Fisher Titus Medical Center as a Point of Care Technician ("POCT"), Goodwin contracted COVID.[5] As noted below, *infra* pp. 8-9, Unum approved Goodwin's short-term disability claim and paid her benefits through June 20, 2021.

By August 2021, Goodwin had been referred to the Cleveland Clinic's Covid Recovery Clinic, 12-2, PID 4901, with a principal diagnosis of "Post-acute sequelae of COVID-19 (PASC)." ECF 12-8, PID 2637; ECF 12-12, PID 4905. Goodwin's "most significant symptoms" were shortage of breath with dyspnea on exertion ("SOB/DOE"), chest pain, "tachycardia/palpitations" and "dizziness." ECF 12-8, PID 2606. Goodwin was referred for consultations with cardiology, neurology, and pulmonology. ECF 12-12, PID 4906.

A neurology clinician suspected that Goodwin suffered from POTS, ECF 12-13, PID 5717. POTS was confirmed via a tilt table test on September 20, 2021. ECF 12-13, PID 5580.

A 48-hour Holter Monitor evaluation also revealed cardiac arrhythmia:

> The rhythm was sinus/sinus arrhythmia with periods of sinus bradycardia and sinus tachycardia. … Rare ventricular ectopy in isolation and couplets. Rare supraventricular ectopics as singles and a couplet. Patient symptoms "walking/ stopped at gas station, lightheaded felt like I could collapse," "walking up stairs, lightheaded dizzy, SOB [shortness of breath], chest pain, collapse." "light jog/ walk back, SOB, chest pain, tachy [*sic*]," and "walking outside, SOB, woozy" all correlated with sinus tachycardia.

ECF 12-13, PID 5580.

On October1, 2021, a Cleveland Clinic cardiologist administered an exercise stress test echocardiogram which was found to be "Abnormal due to Chest discomfort and Poor functional

---

[5] Goodwin began work for Fisher Titus on October 19, 2020. Her last day at work was December 16, 2020. ECF 12-3, PID 188. Goodwin tested positive for COVID-19 on December 20, 2020. ECF 12-8 PID 2606. Her initial COVID symptoms were "headache, nausea, diareha [*sic*], no appetite, chest pain, shortness of breathe [*sic*], tachy[cardia], insomnia." ECF 12-13, PID 5311.

4

capacity." ECF 12-12, PID 5171. The clinician reported that "The estimated MET level achieved was 7.3 using the FRIEND equation. This represents poor functional capacity for age and gender." ECF 12-12, PID 5172.[6]

Another clinician reviewed Goodwin's complaints of "brain fog" and assessed her, as follows:

> Her symptoms are primarily short term memory deficits and difficulty producing words despite knowing what to say. Her main difficulty in terms of localization is in communication between the frontal lobe and her subcortical structures. This can be seen in many chronic health conditions and tends to fluctuate in severity. Do not suspect that this will be a long term problem but symptoms can be improved with mindfulness, light exercise (appreciate POTS related exercise restrictions, Tai Chi and yoga may be beneficial).

ECF 12-11, PID 4532.

Additional Cleveland Clinic testing also documented cognitive deficits, as follows:

> Cognitive Status: Within Functional Limits for Current Session Except
> Cognitive Deficits: Memory Deficits; Executive Function Deficit
> Memory Deficits: Immediate; Short Term

ECF 12-11, PID 4501.

### Goodwin's Occupation

At the time she became disabled, Goodwin was employed by Fisher Titus Medical Center as a Point of Care Technician ("POCT"). Goodwin's occupation required both cognitive and physical ability.

With respect to cognitive ability, Fisher Titus required its POCTs to be "knowledgeable of patient rights" and to ensure "an atmosphere which allows for the privacy, dignity and well-

---

[6] "FRIEND" is an acronym for "the fitness registry and the importance of exercise national database" which measures cardiorespiratory health. MET ("metabolic equivalent") measures metabolic demand for a given work rate. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7356312/ "One MET is equivalent to the amount of oxygen consumed at rest." *Id*. For women under age 29, a MET of less than 7.5 indicates poor cardiac health. https://www.researchgate.net/figure/Estimated-functional-capacity-METs_tbl1_237255521.

being of all patients in a safe, secure environment." ECF 1203, PID 206. POCTs are required to support, cooperate with and understand "specific programs and procedures," for, *inter alia*, "Safety, including universal precautions and safe work practices, establish fire/safety/disaster plans, risk management, and security, report and or correct unsafe working conditions, equipment repair and maintenance needs." *Ibid*.

> Under assessment and direction of the Staff Nurse (RN) and according to established policies and procedures, performs patient care activities in order to assist health care providers in performing various technical and clerical procedures in the patient care area…. The POCT will assist in patient care throughout the department, transporting patients safely via wheelchair or stretcher, bathing, obtaining vital signs, and performing other duties as assigned.

*Ibid*.

A POCT is also required to "Demonstrate[] the skills and judgment necessary to provide patient care under the direct supervision of licensed personnel," and "Accurately obtain and record patient specific data." ECF 12-32, PID 207.

Physically, the job required constant standing and walking (8-12 hrs. per day); and bending, squatting, reaching, lifting, carrying, pushing, and pulling at least 1/3 of the time. ECF 12-2, PID 206. A POCT was expected to lift up to 50 pounds for 1/3 of the time, and in excess of 100 pounds "as patient care presents the need." ECF 12-3, PID 207.[7]

---

[7] This lifting requirement places Goodwin's job in the "heavy" or "very heavy" category of work. *See* 20 C.F.R. § 404.1567(c)-(e) ("Medium work involves lifting <u>no more than</u> 50 pounds at a time… Heavy work involves lifting <u>no more than</u> 100 pounds at a time…. Very heavy work involves lifting objects weighing more than 100 pounds") (emphasis added); *Brooking v. Hartford Life & Acc. Ins. Co.*, 167 F. App'x 544, 549 n.5 (6th Cir. 2006) (taking judicial notice, in an ERISA disability case, of Social Security regulations for purposes of assessing strength requirements).

### The Unum Policies

Two Unum policies are at issue in this case: a policy providing short-term and long-term disability benefits, ECF 12-1. PID 40-108 ("Disability Policy"); and a policy providing life insurance and related benefits, ECF 12-2, PID 109-183 ("Life Policy").

*The Disability Policy*

Under the short-term disability portion of the Disability Policy, a claimant is entitled to 24 weeks of benefits if she is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury, and [has] a 20% or more loss in weekly earnings due to the same sickness or injury." ECF 12-1, PID 44, 60. After a 180-day waiting period, *id*., PID 45, a claimant is entitled to long-term disability benefits for 24 months if she is "limited from performing the material and substantial duties of [her] regular occupation due to [her] sickness or injury, and [has] a 20% or more loss in [her] indexed monthly earnings due to the same sickness or injury." ECF 12-1, PID 44, 68.[8]

The Disability Policy excludes coverage for "pre-existing conditions." ECF 12-1, PID 77. Pre-existing conditions only apply to claimants who become disabled within the first 12 months after disability coverage became effective, ECF 12-1, PID 78. A pre-existing condition is a condition for which a claimant "received treatment, consultation, care or services including diagnostic measures, or took prescribed drugs or medicines in the 3 months" immediately prior to the claimant's effective date of coverage. ECF 12-1, PID 78.

---

[8] For the first 24 months of disability, the short-term and long-term definitions of disability are functionally identical. After 24 months, a claimant must demonstrate that she is disabled from performing the duties of "any gainful occupation for which [she is] reasonably fitted by education, training, or experience." ECF 12-1, PID 68. Only the first 24 months of long-term disability benefits are at issue in this case. Should the Court find in Goodwin's favor, Goodwin will then have the opportunity to establish that she is disabled from any occupation. *Javery v. Lucent Techs., Inc. Long Term Disability Plan for Mgmt. or LBA Emps*., 741 F.3d 686, 690 n. 1 (6th Cir. 2014).

Finally, the Disability Policy permits Unum to require every claimant "to be examined by a physician, other medical practitioner and/or vocational expert of our choice." ECF 12-1, PID 51. In this case, Unum did not avail itself of the opportunity to have Goodwin examined by a physician of its choosing.

*The Life Policy*

The life insurance issue in this case concerns the Life Policy's "waiver-of-premium" ("LWOP") feature. Ordinarily, Unum requires that either the employee or the employer pay premium to keep the life insurance coverage in effect. Unum, however, waives the premium requirement for a disabled individual who is "under age 60 and disabled for 9 months." ECF 12-2, PID 128.

To be disabled for purposes of the Life Policy, an employee must not be working during the "elimination period" (the first 9 months of disability) and "after the elimination period, due to the same injury or sickness, [must be] unable to perform the duties of any gainful occupation for which [she is] reasonably fitted by training, education or experience." ECF 12-2, PID 142.

**Goodwin's Short-Term Disability Claim**

Goodwin's last day at work was December 17, 2020. ECF 12-2, PID 225. She applied for short-term disability benefits on January 29, 2021. ECF 12-3, PID 204-205 225-226. Dr. Seth Ruggles supported Goodwin's application, advising Unum that Goodwin could not work due to dyspnea[9] and "post-covid syndrome." ECF 12-3, PID 223-224.

Unum initially approved Goodwin's STD application for a limited period of time, ECF 12-3, PID 423; extended its approval several times, *id.*, PID 433, 477, 515, and 549; and ultimately approved the claim to the end of the short-term disability period. ECF 12-3, PID 571.

---

[9] "Dyspnea, or shortness of breath, is the feeling that you can't get enough air into your lungs." https://my.clevelandclinic.org/health/symptoms/16942-dyspnea

8

Unum then referred Goodwin's claim to a separate business unit for review of her long-term disability claim. *Id*.

As noted earlier, to qualify for long-term disability benefits Goodwin had to demonstrate that she was unable to perform the material and substantial duties of her regular occupation, the same definition that Unum applied under the short-term disability portion of the policy. Thus Unum reviewed, and concluded on six separate occasions that Goodwin was disabled from performing the essential functions of her own occupation.

### Goodwin's Long-Term Disability Claim

As part of its long-term disability review, Unum asked Dr. Ruggles whether, in his opinion, Goodwin could perform the physical functions of her own occupation.[10] He answered, "No," adding "Patient is unable to perform the above job duties/functions due to ongoing vertigo." ECF 12-3, PID 602.

A Cleveland Clinic neurologist, Dr. Neil Cherian, also submitted a statement on August 6, 2021 (before the POTS diagnosis) confirming Goodwin's condition. In pertinent part, he wrote:

> Ms. Goodwin developed a range of various symptoms after she contracted the COVID infection in December 2020 including a return of her dizziness. In retrospect, the patient was diagnosed as just having a sinus infection per urgent care. Upon my examination of her, I believed, to a reasonable degree of medical certainty that COVID unmasked the previously diagnosed neurological issues within the central nervous system (brain) for which I previously evaluated her. The vertigo/dizziness that the patient presents with can be very difficult to treat. Medications do not always help it. Vestibular physical therapy could be helpful but not always.
>
> There's no doubt that this patient is suffering from Post-COVID syndrome including the shortness of breath, fatigue and heart racing along with the dizziness. The patient has been referred to our COVID Recovery Clinic.

---

[10] Unum's letter actually misstated the physical requirements – it did not mention that Goodwin would be required to lift over 100 pounds if patient needs demanded it. ECF 12-3, PID 602.

On August 12, 2021, Dr. Ruggles submitted a second statement. He wrote, in part:

> Patient has also been seen by other specialists, specifically pulmonology, who have confirmed her ongoing post Covid syndrome symptoms. She therefore has been referred to the long hauler clinic through Cleveland Clinic, which is reserved for post Covid patients that are continuing to suffer from the post Covid syndrome.
>
> Upon review of my medical record/office notes here at this office, she has consistently stated the above noted concerns, both with the dizziness/vertigo, but also the shortness of breath and tachycardia/chest pain.
>
> Upon review of the requirements for her employment, I feel that she is not going to be able to perform these tasks, specifically the significant physical demands, of lifting/carrying and caring for patients – due to post-covid syndrome….
>
> I agree with Neurology, that within a reasonable degree of medical certainty, all her symptoms are secondary to her Covid infection, and post-covid syndrome.

ECF 12-6, PID 1638.

Unum also wrote to Dr. Cherien and asked specifically if he believed that Goodwin could return to work in her own occupation. He answered "no," and added, "Patient is dealing with ongoing and or worsening lightheadedness, elevated heart rate (subjective and as indicated by her Apple watch), shortness of breath and chest pain. I am concerned that patient is experiencing POTS…. If POTS is confirmed, it may explain some of the fatigue, some of the dizziness and the heart rate variability." ECF 12-7, PID 1928.[11]

The statements from Goodwin's physicians notwithstanding, Unum denied Goodwin's long-term disability claim on September 8, 2021. ECF 12-7, PID 2010-2016. Goodwin timely appealed, ECF 12-8, PID 2587, but Unum rejected her appeal. ECF 12-10, PID 4022-4029.

---

[11] Another clinician, Kyle Shannon, APRN, CNP, wrote in a note, "I discussed that I do not do disability paperwork, but am willing to write a letter for this." ECF 12-13, PID 5580.

10

# ARGUMENT

**I.      The Court's review of this claim is *de novo*.**

**A. The Court's review must be *de novo* to comport with standards of due process.**

Goodwin recognizes that this Court is bound by the Sixth Circuit precedent set forth in Part I.B. below. Nevertheless, Goodwin asserts that a review of her claim on other that a *de novo* basis is inconsistent with the fundamental requirements of due process.

The plaintiffs in *Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Tr. for S. California*, 508 U.S. 602 (1993), asserted just such a due process violation in a case where the trustees of a multi-employer pension plan had assessed withdrawal liability against them. Citing and quoting host of precedents, the Supreme Court agreed that due process required a neutral decision-maker:

> As against these supposed threats to the trustees' neutrality, due process requires a neutral and detached judge in the first instance, and the command is no different when a legislature delegates adjudicative functions to a private party. That officers acting in a judicial or quasi-judicial capacity are disqualified by their interest in the controversy to be decided is, of course, the general rule. Before one may be deprived of a protected interest, whether in a criminal or civil setting, one is entitled as a matter of due process of law to an adjudicator who is not in a situation which would offer a possible temptation to the average man as a judge ... which might lead him not to hold the balance nice, clear and true.... Even appeal and a trial de novo will not cure a failure to provide a neutral and detached adjudicator.
>
> "[J]ustice," indeed, "must satisfy the appearance of justice, and this stringent rule may sometimes bar trial [even] by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties." This, too, is no less true where a private party is given statutory authority to adjudicate a dispute, and we will assume that the possibility of bias, if only that stemming from the trustees' statutory role and fiduciary obligation, would suffice to bar the trustees from serving as adjudicators of Concrete Pipe's withdrawal liability.

508 U.S. at 617–18. (citations and quotations omitted). *See also*, *id*., at 649 (Thomas, J. concurring in part and concurring in judgment) ("in the Court's view, there would be a substantial question of procedural fairness under the Due Process Clause if employers had to show that sponsors' findings were unreasonable or clearly erroneous") (quotation omitted).

The Court said, however, that these due process principles did not apply when a party was acting in an "enforcement capacity," rather than an adjudicative capacity. Under those circumstances, the Court said, "due process may be satisfied by providing for a neutral adjudicator to conduct a de novo review of all factual and legal issues." 508 U.S. at 618 (quotation and citation omitted).

In this case, however, when it denied Goodman's claims, Unum was acting in an adjudicative capacity; *i.e.*, "as judge in its own cause." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011). And for the Court to defer to Unum's decision, in any respect, would be to violate the principles of due process set forth in *Concrete Pipe*. This Court's review, therefore, must be *de novo*.

**B. In the alternative, under current Sixth Circuit precedent, this Court's review of this claim is *de novo* unless Unum establishes that it is entitled to deferential review.**

"[A] denial of benefits" covered by ERISA "is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Unum bears the burden of proving that it is entitled to a deferential standard. *Crider v. Highmark Life Ins. Co.*, 458 F. Supp. 2d 487, 501 (W. D. Mich. 2006), citing, *inter alia*, *Brooking v. Hartford Life & Acc. Ins. Co.*, 167 Fed. Appx. 544, 547 (6th Cir. 2006). To the extent Unum believes it is entitled to a deferential standard of review, it will surely raise it in its own motion. Goodwin will respond as appropriate if Unum does so.

12

**II. Without regard to the standard of review, Unum's long-term disability decision should be reversed.**

Goodwin's long-term disability claim, and Unum's disposition of it, present two issues for the Court. First, is Goodwin disabled from working as a POCT? And second, is Goodwin's disability the product of a pre-existing condition. Each issue is addressed below.

**A. The record unambiguously establishes that Goodwin is unable to work as a Point of Care Technician.**

A POCT is roughly equivalent to a hospital orderly or a nursing assistant. Her job is to "take care of people, taking vitals, answering call lights…" She "Turns and repositions bedfast patients, alone or with assistance, to prevent bedsores … Takes and records temperature, blood pressure, pulse and respiration rates, and food and fluid intake and output." ECF 12-5, PID 1133-1134.

Two of Goodwin's physicians, Dr. Cherien and Dr. Ruggles, specifically opined that, due to her post-COVID "sequelae," Goodwin was incapable of performing this kind of work. And their opinions are bolstered by a variety of objective and subjective measurements.

The tilt test, Holter monitor evaluation, and stress test are all objective measures that confirmed the diagnosis of POTS and its accompanying problems – fatigue, orthostatic intolerance, tachycardia, and cognitive impairment. Goodwin's "brain fog" was determined, by expert analysis, to be a problem of "communication between the frontal lobe and her subcortical structures."

Goodwin's cognitive deficits – limits in executive function and immediate- and short-term memory – were documented by objective testing. And Goodwin's capacity for physical work was assessed – again through objective testing – to be "poor."

13

By way of contrast, Unum's determination that Godwin was not disabled was based solely on a series of file reviews, many of which questioned the veracity of Goodwin's physical complaints, and all of which rejected the objective findings discussed above.

"The [Sixth Circuit] has … approved assigning more weight to evidence from a treating physician than a record reviewer who did not conduct an in-person evaluation." *Rouleau v. Liberty Life Assurance Co. of Boston*, No. 1:15-cv-546, 2017 WL 359466 *8 (W. D. Mich. Jan. 25, 2017), *citing Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 806 (6th Cir. 2002); *Kalish v. Liberty Mutual/Liberty Life Assur. Co. of Boston*, 419 F. 3d 501, 508 (6th Cir. 2005); and *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).

Likewise, it is well-accepted in this circuit that a file review that challenges a claimant's credibility is entitled to no weight. *Javery v. Lucent Technologies, Inc. Long Term Disability Plan for Mgmt. or LBA Employees*, 741 F.3d 686, 702 (6th Cir. 2014) ("reliance on a file review is inappropriate where a claims administrator disputes the credibility of a claimant's complaints."); *Wagner v. Am. United Life Ins. Co.*, 731 F. App'x 495, 497 (6th Cir. 2018) ("That type of credibility opinion is entitled to little weight when based on a paper review—especially when the insurer can order an in-person examination.").

Two other points bear mention. First, Unum's decision failed to take into account that Goodwin's cognitive difficulties would inhibit her ability to perform the essential mental functions of her job. *See Haning v. Hartford Life & Accident Ins. Co.*, 140 F. Supp. 3d 654, 673 (S.D. Ohio 2015) ("the Sixth Circuit has admonished plan administrators not to overlook the intellectual or social aspects of a claimant's job when terminating or denying their disability benefits").

14

Second, in declaring that Goodwin could work, Unum failed to consider the effect of her returning to work on patients she might serve.  The Sixth Circuit highlighted this point in *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499 (6th Cir. 2009).  The claimant in that case was an OB/GYN who suffered cervical back pain documented by MRI and ultimately requiring surgical intervention.  571 F.3d at 500-501.

The insurer terminated Kramer's disability benefits after it obtained surveillance video showing her "preparing her boat for winter storage."  571 F.3d at 507.  The Sixth Circuit quoted favorably the district court's observation that "closing down a boat … is an infrequent event," whereas, "as an OB/GYN, Plaintiff needs to be able to deliver babies or perform surgeries far more regularly."  *Id*., at 507-508.

More relevantly, the Court noted (again quoting the district court), "Further, on the day she worked on her boat, she placed only her own health at risk, but while performing deliveries or surgeries, she was responsible for the life and health of her patients."  *Id*., at 508.

Goodwin's brain fog and related cognitive limitations would plainly endanger the health and well-being of patients under her care.  And her physical limitations would prevent her from performing the lifting, pushing and pulling that those patients required.

Finally, as the Unum note quoted above, *supra* at 2, amply demonstrates, Goodwin's fatigue disables her from performing any productive work.  ECF 12-6, PID 1744 ("It seemed that the longer the call lasted the more this happened, indicating a level of fatigue.  Also her voice became softer through the call, and the speech pattern more deliberate.  By the end of the call EE states that her chest was hurting and she was tired.").

Goodwin's evidence proves that she is disabled and unable to return to work at her own occupation.

15

### B. Unum has failed to prove that Goodwin's disability is the product of a preexisting condition.

Goodwin's log-term disability coverage became effective December 1, 2020, and she became disabled shortly thereafter. The parties agree that the pre-existing condition exclusion in the Unum policy is potentially applicable and that the look-back period is September 1, 2020, through November 30, 2020. ECF 12-7, PID 2010.

The Sixth Circuit has held on several occasions that the insurer of an ERISA-governed policy bears the burden of proving the application of an exclusion. *See, e.g., Okuno v. Reliance Standard Life Ins. Co.*, 836 F.3d 600, 609 (6th Cir. 2016) ("Reliance bears the burden to show that the exclusion on which it based denial of benefits, the Mental and Nervous Disorder Limitation, applies in this case."); *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 443 (6th Cir. 2005), citing *Caffey v. Unum Life Ins. Co.*, 302 F.3d 576, 580 (6th Cir. 2002) ("An ERISA plan, not the participant, has the burden of proving an exclusion applies to deny benefits."); *Collins v. Unum Life Ins. Co. of Am.*, 682 F. App'x 381, 385 (6th Cir. 2017) ("Because the denial of benefits here is based on an exclusion, Unum has the burden of proving the exclusion applies."); *Foltz v. Barnhart Crane & Rigging, Inc.*, 636 F. App'x 677, 680–81 (6th Cir. 2016) ("When an ERISA plan relies on an exclusion to deny benefits, however, the plan (not the employee) has the burden of proving that the exclusion applies.").

Moreover, it is hornbook law that "[e]xclusions in insurance policies are construed narrowly such that that which is not clearly excluded from the operation of the contract is included in the operation thereof." *Mosser Const., Inc. v. The Travelers Indem. Co.*, 430 F. App'x 417, 421 (6th Cir. 2011) (applying Ohio law, quotations and citations omitted). *See also Russcher v. Outdoor Underwriters, Inc.*, 821 Fed. Appx. 509, 515 (6th Cir. 2020) ("[A]n exclusion from liability must be clear and exact in order to be given effect.") (quoting Ohio law).

16

*See also Bradshaw v. Reliance Standard Life Ins. Co.*, 707 F. App'x 599, 607 (11th Cir. 2017) ("The insurer must make clear what is excluded from coverage. And under ERISA, clauses that exclude coverage are interpreted narrowly.") (citations omitted); *Critchlow v. First UNUM Life Ins. Co. of Am.*, 378 F.3d 246, 256 (2d Cir. 2004) ("when the issue is the proper interpretation of a clause that excludes a particular condition or occurrence from the coverage provided by the policy, the exclusion clause should be read narrowly rather than expansively"); *Fought v. UNUM Life Ins. Co. Of Am.*, 379 F.3d 997, 1011 (10th Cir. 2004) ("To read the exclusion as broadly as UNUM, counters the essential tenets of contract law: Exclusions must be interpreted narrowly.").

Unum's assertion that Goodwin's disability was the product of a pre-existing condition suffers from two flaws. First, Unum's argument rests on an unsupported assumption – that the condition that produced Goodwin's post-COVID vertigo is the same condition from which she suffered during the three-month look-back period. The evidence establishes – beyond doubt – that Goodwin's post-COVID vertigo stems from POTS.[12] And there is no evidence that Goodwin suffered from POTS before beginning work at Fisher Titus Medical Center.

Second, Goodwin's vertigo is in any case tangential to the other conditions that disable her. Several Cleveland Clinic summaries do not even list vertigo as a problem. *See, e.g.,* ECF 12-8, PID 2625 (noting "Post-acute sequelae of COVID-19 (PASC), SOB (shortness of breath), Chest pain, unspecified type, Palpitations, Tachycardia" but not dizziness or vertigo).

The evidence shows that Goodwin is disabled by fatigue, orthostatic intolerance, tachycardia, "brain fog," and cognitive problems. None of these is related to vertigo or dizziness.

---

[12] In her initial assessment the clinician at the Cleveland Clinic reported that the pre-existing vertigo "Had been under control until COVID" and that the patient "Describes a different level of dizziness, not the same as vertigo." ECF 12-8, PID 2606.

Unum has the burden to prove that Goodwin's claim is barred by the pre-existing condition limitations, and Unum has not carried that burden.

* * *

Goodwin's evidence proves that she is disabled from performing the function of her own occupation, and Unum has not proven that Goodwin's disability is the product of a pre-existing condition. Judgment should be entered for Goodwin.

### III. The evidence establishes that Goodwin is disabled for purposes of the LWOP benefit under the provisions of the Life Policy.

The showing that Goodwin must make to establish disability under the Life Policy is greater than that required for the Disability Policy – she must prove by a preponderance of the evidence that she is disabled from any occupation. Nevertheless, Goodwin's evidence easily clears that threshold.

The exercise stress test alone establishes that Goodwin has "poor functional capacity" for work. ECF 12-12, PID 5172. Couple that with the fatigue noted by the Unum reviewer in her phone call, and the documented problems with orthostatic intolerance, tachycardia, shortness of breath, and brain fog, and there can be no reasonable doubt that Goodwin has established that she is totally disabled.

### IV. The appropriate remedy is to order Unum to reinstate Goodwin's LWOP coverage and to award Goodwin her long-term disability benefits from the date they should have begun until the date the Court enters judgment.

As a remedy for an erroneous benefit plan decision, "courts may either award benefits to the claimant or remand to the plan administrator." *Haning*, 140 F. Supp. 3d at 675, quoting *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 621 (6th Cir. 2006). "[W]here claimants have clearly established their disability, the appropriate remedy is an immediate award of benefits

rather than a remand to consider previously ignored evidence." *Haning*, *id.*, citing *Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 513 (6th Cir. 2005)

"As the Sixth Circuit has warned, '[p]lan administrators should not be given two bites at the proverbial apple where the claimant is clearly entitled to disability benefits.' Instead, '[t]hey need to properly and fairly evaluate the claim the first time around; otherwise they take the risk of not getting a second chance, except in cases where the adequacy of claimant's proof is reasonably debatable.'" *Haning*, at 675-76, quoting *Cooper v. Life Ins. Co. of N. America*, 486 F.3d 157, 172 (6th Cir. 2007).

In this case, the adequacy of Goodwin's proof is not reasonably debatable. Her evidence establishes that she is unable to perform the essential functions of her own occupation for purposes of her long-term disability claim, and that she is disabled from any occupation for purposes of her LWOP claim.

## CONCLUSION

The Court should enter Judgment on the Administrative Record in favor of Goodwin on both her claim for long-term disability benefits and her claim for LWOP coverage.

                                                      Respectfully submitted,

                                                      /s/ Tony C. Merry
                                                     Tony C. Merry    (0042471)
                                                     Trial Attorney
                                                     Law Offices of Tony C. Merry, LLC
                                                     7100 N. High Street, Suite 302
                                                     Worthington, Ohio 43085
                                                     (614) 372-7114
                                                     (614) 505-6109 [fax]
                                                     tmerry@tmerrylaw.com
                                                     Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

    This is to certify that a copy of the foregoing was filed via the Court's Electronic Filing System and intended to be served upon all counsel of record via the Court's electronic mail system this 15th day of May 2023.

                                                /s/ Tony C. Merry
                                             Tony C. Merry     (0042471)